CAUSE NO. 2023-35040

| | | |
|---|---|---|
| JANE DOE (K.D.) | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ISHVARPREMI HOSPITALITY LLC | § | |
| D/B/A RED ROOF INN and USA | § | |
| HOTEL LODGING LTD D/B/A | § | |
| RED ROOF INN, RED ROOF INNS, INC., | § | |
| RRF HOLDING COMPANY, LLC RED | | |
| ROOF FRANCHISING, LLC, and RRI | | |
| WEST MANAGEMENT, LLC | | |
| *Defendants* | § | 11TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MASTER DOCKET NO. 2020-28545

| | | |
|---|---|---|
| IN RE JANE DOES CASES | § | 11TH MDL CIVIL COURT |
| | § | |
| MDL NO. 19-0991 | § | HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Transferred From:
CAUSE NO. DC-23-CV-0459

| | | |
|---|---|---|
| K.D. | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | LUBBOCK COUNTY, TEXAS |
| | § | |
| ISHVARPREMI HOSPITALITY LLC | § | |
| D/B/A RED ROOF INN and USA | § | |
| HOTEL LODGING LTD D/B/A | § | |
| RED ROOF INN, RED ROOF INNS, INC., | § | |
| RRF HOLDING COMPANY, LLC RED | | |
| ROOF FRANCHISING, LLC, and RRI | | |
| WEST MANAGEMENT, LLC | | |
| *Defendants* | § | 99TH JUDICIAL DISTRICT |

## **PLAINTIFF'S FIRST AMENDED PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

Jane Doe (K.D.), Plaintiff in the above-styled and numbered cause, files this First Amended Petition against ISHVARPREMI HOSPITALITY LLC D/B/A RED ROOF INN, USA HOTEL LODGING LTD D/B/A RED ROOF INN, RED ROOF INNS, INC., RRF HOLDING COMPANY, LLC RED ROOF FRANCHISING, LLC, RRI WEST MANAGEMENT, LLC, RED ROOF INNS, INC., RRF HOLDING COMPANY, LLC RED ROOF FRANCHISING, LLC, and RRI WEST MANAGEMENT, LLC as Defendants, and respectfully shows the Court as follows:

## I.     <u>SUMMARY OF CASE</u>

1.     K.D. is a survivor of sex trafficking. She files this civil lawsuit seeking compensation for the harm she suffered from her trafficking at lodging facilities that were owned, operated, maintained, and controlled by Defendants and their agents and employees. Specifically, she was repeatedly trafficked at the Red Roof Inn at 6800 I-40 Frontage Rd, Amarillo, TX 79106 ("Amarillo Red Roof Inn") and the Red Roof Inn at 6624 Interstate 27, Lubbock, TX 79404 ("Lubbock Red Roof Inn").

2.     Sex trafficking has become a public-health crisis of epidemic proportions in the United States. It is now widely recognized—including by Congress and state legislatures—that effectively combating sex trafficking requires more than the criminal prosecution of traffickers and sex buyers.

3.     Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

4.     In 2008, Congress expressly expanded the scope of civil liability under the TVPRA to reach not only direct perpetrators of trafficking, but also those who—while not themselves

committing the underlying trafficking acts—knowingly benefit, financially or otherwise, from participation in a venture that they knew or should have known was engaged in sex trafficking.

5.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing and maintaining hotel venues where traffickers could harbor, control, and exploit victims, including K.D., with minimal risk of detection or interruption. Despite obvious and pervasive signs of ongoing sex trafficking at these properties, Defendants continued their business relationships with traffickers, including K.D.'s traffickers. Defendants therefore knowingly benefited from participation in ventures that they knew or should have known were engaged in sex trafficking, in violation of the TVPRA.

## II.    DISCOVERY CONTROL PLAN

6.      K.D. intends to conduct discovery pursuant to Texas Rule of Civil Procedure 190.4 (Level 3) and the latest TX MDL No. 19-0991 Case Management Order.

## III.    JURISDICTION AND VENUE

7.      Venue is proper in this Court pursuant to Texas Civ. Prac. & Rem. Code 15.002 because all or a substantial part of the events giving rise to this lawsuit occurred in Lubbock County, Texas, and because at least one Defendant maintains its principal office in the State of Texas.

8.      Venue is therefore proper over all other defendants pursuant to Texas Civ. Prac. & Rem. Code 15.005.

9.      K.D.'s damages are in excess of $1,000,000.00.

10.     This Court has subject-matter jurisdiction over Plaintiff's TVPRA claims under §1595(a) of the TVPRA pursuant to Tex. Gov't Code Ann. § 24.007. Federal and state courts have concurrent jurisdiction over claims under §1595(a) of the TVPRA.

## IV.     PARTIES

### A.     PLAINTIFF

11.     Plaintiff K.D. is a resident of Taylor County, Texas. She may be contacted through her lead counsel, whose information is contained below.

12.     K.D. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, while she was a minor and through use of force, fraud, or coercion, to engage in a commercial sex act

13.     There is a collective and compelling interest in keeping K.D.'s identity anonymous.

### B.     DEFENDANTS

14.     Ishvarpremi Hospitality LLC d/b/a Red Roof Inn ("Ishvarpremi ") is a for-profit Texas company with its principal place of business in Lubock, Texas.  Ishvarpremi has been served and is before the Court.

15.     Ishvarpremi owned and operated the Lubbock Red Roof Inn where K.D. was trafficked.

16.     USA Hotel Lodging Ltd d/b/a Red Roof Inn ("USA Lodging") is a for-profit Texas company with its principal place of business in Amarillo, TX. USA Lodging has been served and is before the Court.

17.     USA Lodging owned and operated the Amarillo Red Roof Inn where K.D. was trafficked.

18.     Ishvarpremi and USA Lodging are collectively referred to herein as "Franchisee Defendants."

19.     Defendant Red Roof Inns, Inc. d/b/a Red Roof Inn ("RRI Inc.") is a Delaware corporation with its principal place of business in Ohio. At all relevant times, it did business in

Texas through its participation in, benefit from, and control over operations of the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

20.     RRF Holding Company, LLC, ("RRF Holding") is a Delaware corporation with its principal place of business in Ohio. At all relevant times, it did business in Texas through its participation in, benefit from, and control over operations of the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

21.     Defendant Red Roof Franchising, LLC d/b/a Red Roof Inn ("RRI Franchising") is a Delaware Limited Liability Company with its principal office in Ohio. At all relevant times, it did business in Texas through its participation in, benefit from, and control over operations of the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

22.     Defendant RRI West Management, LLC d/b/a Red Roof Inn ("RRI West Management") is a Delaware Limited Liability Company. At all relevant times, it did business in Texas through its participation in, benefit from, and control over operations of the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

23.     RRI Inc., RRF Holding, RRI Franchising, and RRI West Management, are referred to collectively as the "RRI Defendants."

## V.     RULE 28 ASSUMED OR COMMON NAME

24.     K.D. brings this petition against Defendants in their assumed or common name and expressly reserves the right under Texas Rule of Civil Procedure 28 to substitute the true name of any Defendant if needed or in response to Court Order.  Moreover, K.D. expressly invokes the right to amend under the doctrine of misnomer if any Defendants have been properly served but were done so under the wrong legal name.

# VI.     STATEMENT OF FACTS

## I.     K.D. is a Survivor of Sex Trafficking.

25.     In 2013, K.D. had recently separated from the father of her children and was living in a domestic-violence shelter when she reconnected with an old acquaintance, "T.," who later became her first trafficker. Although T. initially represented that he wanted a romantic relationship with K.D., he quickly exploited her vulnerable circumstances. T. made K.D. financially and emotionally dependent on him and supplied her with drugs, causing her to develop a dependency. He then posted K.D. online without her consent and used the control he had established to coerce her into engaging in commercial sex. T. retained all proceeds from the commercial sex and used financial deprivation and control over K.D.'s access to basic necessities and drugs to further coerce her, repeatedly threatening to leave her on the streets and without access to drugs if she failed to comply with his demands.

26.     Between 2013 and the summer of 2015, T. moved K.D. among various hotels and motels, including the Amarillo Red Roof Inn and the Lubbock Red Roof Inn. During this period, K.D. had no permanent residence and, while being trafficked by T., lost her vehicle through a title loan, further increasing her dependence on him. Over time, T. became increasingly controlling and abusive. He confiscated K.D.'s identification and wallet, forcibly injected her with heroin, and subjected her to repeated verbal abuse and degradation. When T. realized that K.D. was attempting to leave him, he escalated to physical violence.

27.     In or around the summer of 2015, T. was diagnosed with a terminal illness. Around the same time, K.D. was able to leave T., though not without experiencing physical violence as she attempted to escape.

28.     Almost immediately thereafter, K.D. came under the control of her second trafficker, "M." M. was an acquaintance of T. whom K.D. had met while she was being trafficked by T. When K.D. left T., she had no money, no vehicle, and no stable place to live. M.—who trafficked multiple women—used another victim to recruit K.D., falsely promising that M. would help her get on her feet and achieve financial stability. These promises were false, and M. quickly began trafficking K.D.

29.     M. was verbally and psychologically abusive, extremely controlling, and more physically violent than T. had been. He also exploited K.D.'s drug dependence, which had developed while she was being trafficked by T., as a means of further coercion and control.

30.     Between 2015 and 2018, M. trafficked K.D. at hotels, including the Abilene Red Roof Inn and the Lubbock Red Roof Inn. During this period, K.D. attempted to escape from M. on multiple occasions, but he located her and resumed trafficking her.

31.     In 2018, K.D. was finally able to escape from M. by leaving a hotel in the Lubbock area, going to a nearby Walmart, and obtaining assistance from strangers.

32.     Both T. and M. trafficked K.D. at hotels selected by the traffickers. They consistently chose hotels that they knew had reputations for tolerating trafficking and other criminal activity and where it was easy to operate without interference from hotel staff. For these reasons, both traffickers repeatedly brought K.D. to the Amarillo Red Roof Inn and the Lubbock Red Roof Inn.

## II.     Human Trafficking and Sexual Exploitation are a Rampant, Well-known Problem in the Hotel Industry.

33.     The widely known and pervasive relationship between sex trafficking and lodging facilities necessarily shapes what each Defendant knew or should have known regarding the trafficking at the Amarillo Red Roof Inn and the Lubbock Red Roof Inn, including K.D.'s trafficking.

34.     Today, sex trafficking is pervasive in the United States, and lodging facilities are the primary place where it happens.[1] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[2] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[3] Hotels have been found to account for over 90% of commercial exploitation of children.[4] Sex trafficking has also, at all relevant times, been known to be a significant and widespread problem at extended-stay facilities.

35.     Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations—including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, EPCAT, and others—have devoted significant efforts to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking.

36.     This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a lodging environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in

---

[1] This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[2] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post, June 2016, at http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_us_57714091e4b0f168323a1ed7

[3] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hotel Industry, Cornell Hotel Report, October 2015, at https://scholarship.sha.cornell.edu/cgi/vi ewcontent.cgi?article=1222&context=chrpubs Oct. 2015

[4] See Erika R. George and Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay. These recurring indicators are known as "red flags" of sex trafficking.

37.    Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff at a lodging facility include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;

- a group of girls who appears to be traveling with an older female or male;

- a group with similar tattoos, which can indicate "branding" by a trafficker;

- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;

- individuals who seem disoriented;

- individuals showing signs of physical abuse;

- individuals showing signs of restrain or confinement;

- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;

- individuals with signs of untreated illness or injuries;

- individuals who appear to lack freedom of movement;

- individuals who are being constantly monitored and/or escorted around the hotel;

- individuals who avoid eye contact;

- individuals who avoid interactions with others;

- individuals who are not in possessions of their own identification;

- individuals who have few or no personal possessions;

- individuals who dress provocatively;

- a high volume of men who are not registered guests entering and exiting a room; and

- individuals who wait in common areas while other men frequent the room.

38.    Recognized "red flags" of sex trafficking that can be detected by front-desk staff and security include:

- patrons appeared distressed at check-in;

- the same person reserving multiple rooms;

- rooms paid for with cash or prepaid cards;

- rooms are paid for one day at a time;

- requests for isolated rooms or rooms close to an exit;

- use of hotel computers for adult oriented or sexually explicit websites;

- patrons not forthcoming about identifying information when registering;

- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;

- individuals lack identification;

- car in the parking lot is parked so license plate is not visible;

- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and

- individual appears to be giving scripted responses.

- Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff include:

- constant use of the "Do Not Disturb" sign;

- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;

- refusal of cleaning services for multiple days;

- excessive amounts of cash in a room;

- presence of multiple computers, cell phones, pagers, or other technology;

- the same person reserving multiple rooms;

- individuals leaving the room infrequently, not at all, or at unusual hours;

- individuals loitering in hallways or appearing to monitor a room;

- excessive alcohol in a room;

- illegal drugs in a room;

- evidence of pornography;

- excessive number of people staying in a room;

- guests with few or no personal possessions in room;

- provocative clothing and shoes;

- constant flow of men into a room at all hours; and

- excessive amounts of sex paraphernalia in rooms.

39.    Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[5] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and
- excessive amounts of sex paraphernalia in rooms.

40.    The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff.

41.    Before K.D.'s trafficking, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as

---

[5] *See id.*

indicators specific to sex trafficking. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed or should have instructed their staff to treat them as signs of sex trafficking when observed.

42.     There is a well-known link between commercial sex in a lodging environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion. As a result, these women are victims of sex trafficking. Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network. It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"

43.     When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking.

44.     Defendants, as members of the lodging industry, were educated and trained on the link between commercial sex in a hotel and sex trafficking. Accordingly, as of the time of K.D.'s trafficking, each Defendant knew and recognized that signs of commercial sex at their facilities are and should be treated as signs of sex trafficking.

45.     Each Defendant knew that the link between commercial sex in a lodging environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary

prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

46.    The most effective weapon against sexual exploitation and human trafficking is education and training.[6] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[7]

47.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[8] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

48.    Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

---

[6] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[7] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[8] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

49.     Defendants have made the choice to ignore their knowledge of sex trafficking in their hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have chosen to continue to benefit from sex trafficking of victims like K.D.

### III.     Sex Trafficking Has Long Been Prevalent at RRI Branded Properties, and Defendants Have Known About It.

50.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before K.D.'s trafficking, that sex trafficking was ongoing and widespread at RRI branded properties including the subject RRI properties.

51.     Use of RRI branded properties for sex trafficking is well known to the Defendants. RRI hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[9]

52.     Unfortunately for K.D., Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like K.D.

53.     Upon information and belief, each of the Defendants monitored criminal activity occurring at RRI branded hotels and was aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where K.D. was trafficked.

---

[9] https://traffickinginstitute.org/wp-content/uploads/2022/01/2018-Federal-Human-Trafficking-Report-Low-Res.pdf;
https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf

54.     Scores of news stories from across the U.S. highlight RRI Defendants' facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of RRI branded hotels for sex trafficking.

55.     By way of example, the Woburn, Massachusetts Daily Times reported as early as February 2000 that its Red Roof Inn was facing closure by the city licensing commission as a result of pervasive criminal activity, prostitution, and sex trafficking. [10] Such criminal conduct continued unabated until at least 2012, when Vice President of Operations for Red Roof Inn Joesph Maddux was forced to appear before the Licensing Commission. Responding to reports of dangerous men using prostitutes as young as fourteen (14) at the Woburn Red Roof Inn and 118 police reports from 2011 alone, Maddux assured the Licensing Commission that Red Roof Inn's President and legal department had been updated and outlined some of the steps the company was considering to address criminal activity, including prostitution, at its branded properties: [11]

- Installation and prominent display of new security systems providing 24-hour monitoring;
- Institution of nation-wide changes to its registration policies and the information obtained at check-in;
- Increased physical security of the Red Roof Inn location;
- Elimination of smoking floor(s); and
- Hotel upgrades and price increases to price rooms beyond the criminal clientele.

Sadly, there is no evidence that any such steps were taken in Woburn or across the country.  In July 2020, the Woburn License Commission again instituted action against the Red Roof Inn

---

[10] https://woburnpubliclibrary.org/wp-content/uploads/2019/03/Woburn-Daily-Times-1904-1980-Non-consecutive-1995-2014.pdf l

[11] http://homenewshere.com/daily_times_chronicle/news/woburn/article_99cddca6-5983-11e1-8393-0019bb2963f4.html

location following over 150 police incident reports including those for "human trafficking, prostitution and drugs…"[12]

56.    Information that has become public through news stories establishes the entrenched and pervasive nature of RRI's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of RRI branded hotels for illegal activity, the following was noted:

- In 2010, a man and woman appeared in court on charges of trafficking a 14-year-old Milwaukee girl at a Red Roof Inn in Oak Creek, Wisconsin. At the Red Roof Inn, the traffickers gave the girl marijuana to smoke and then took pictures of her naked, which were put on a local website.[13]

- In 2010, 2 were charged with transporting a minor to engage in prostitution after a 17-year-old California runaway was trafficked at Red Roof Inn locations in New York and Maryland.[14]

- In 2012, a Pennsylvania man was indicted by a federal grand jury on charges of sex trafficking involving a 16-year-old girl who was trafficked at a New Jersey Red Roof Inn in May 2012.[15] In 2014 he was sentenced to 10 years in federal prison.[16]

- In 2012, a Minneapolis police officer investigating juvenile sex trafficking activity spotted an ad on the website Backpage.com that depicted the image of a provocatively dressed young woman offering "unrushed service, full of pleasure." The officer called the number on the ad and spoke with a female who said she was at the Red Roof Inn in Woodbury.[17]

---

[12] https://woburnma.gov/wp-content/uploads/2020/08/7-23-20-License-Commission-minutes.pdf
[13] John Diedrich, *2 face federal sex-trafficking charges*, Milwaukee Journal Sentinel (June 16, 2010), https://archive.jsonline.com/news/crime/96508359.html/
[14] https://www.washingtonexaminer.com/teen-prostituted-held-against-her-will-in-md-and-va-hotels-feds-say
[15] Press Release, The Federal Bureau of Investigation, Pennsylvania Man Charged with Sex Trafficking of a Minor (June 27, 2012), https://archives.fbi.gov/archives/newark/press-releases/2012/pennsylvania-man-charged-with-sex-trafficking-of-a-minor
[16] Michaelangelo Conte, *Man charged with sex trafficking a teen he met in Secaucus takes plea*, nj.com (Mar. 28, 2014), https://www.nj.com/hudson/2014/03/man_originally_charged_with_sex_trafficking_a_16-year-old_he_met_in_secaucus_takes_a_plea.html.
[17] Mike Longaecker, *Police: Sex trafficking victim turns up at Woodbury hotel*, Republican Eagle (August 17, 2012), https://www.republicaneagle.com/news/public_safety/police-sex-trafficking-victim-turns-up-at-woodbury-hotel/article_88eac778-73b4-50cb-ac65-182279d50948.html

- In 2012, a Rochester man and woman were charged in a sex trafficking case of a minor. Investigators determined that two customers paid to have sex with the victim and the woman arrested at the Red Roof Inn.[18]

- In 2012, two teenage girls were human trafficking victims at a RRI in Charlotte, North Carolina. In subsequent interviews with other human trafficking victims, they alleged their pimps would pay RRI managers and maids to not report illegal activities.[19] RRI eventually pulled its brand from the hotel. [20]

- In 2013, a 50-year-old man was charged with prostitution and human trafficking, for forcing a woman to perform sex acts against her will at the Red Roof Inn on Eisenhower Boulevard in Pennsylvania.[21]

- In 2013, a local news station investigated a Florida Red Roof Inn because of the high volume of search warrants that continued to pop up for the hotel, including multiple warrants that reported a high volume of prostitution activity at the hotel.[22]

- In 2013, a Lubbock grand jury indicted four suspects arrested during a prostitution sting. Police discovered two underage victims during their sting operation at the Red Roof Inn.[23]

- The Knox County Sheriff's Office arrested a Knoxville man for human trafficking at a Red Roof Inn in 2013.[24]

- In 2014, a Cincinnati man plead guilty in U.S District Court to locking up women in his Avondale home, then driving them to Red Roof Inn in Louisville where he forced them into prostitution.[25]

- In 2014, a Rhode Island man pled guilty to attempted sex trafficking after he was accused of trying to procure customers to have sex with a 23-year-old woman in the Red Roof Inn on Wolf Road on Aug. 22, 2012.[26]

---

[18]Department of Justice, *ROCHESTER MAN AND WOMAN CHARGED IN SEX TRAFFICKING CASE* (Dec. 14, 2012), https://www.justice.gov/archive/usao/nyw/2012/TwoCharged.pdf

[19] *FBI investigating teen human trafficking at Charlotte hotel*, WBTV3 (Sept. 17, 2015), https://www.wbtv.com/story/30058536/fbi-investigating-teen-human-trafficking-at-charlotte-hotel/.

[20] *Id.*

[21] Brittany Miller, *Man charged in prostitution ring headed to Dauphin County court*, Penn Live Patriot News(October 9, 2013), https://www.pennlive.com/midstate/2013/10/post_625.html

[22] https://www.abcactionnews.com/news/motel-frequently-involved-in-criminal-activity-sees-more-than-200-calls-for-service-this-year

[23] *4 indicted on prostitution charges after Red Roof Inn sting*, KCBD News 11 (August 28, 2013), https://www.kcbd.com/story/23272377/4-charged-with-prostitution-offenses-after-red-roof-inn-sting/

[24] https://www.endslaverytn.org/news/knoxville-man-faces-human-trafficking-charges-newsarticle

[25] *https://www.fox19.com/story/27390036/avondale-man-pleads-guilty-to-sex-trafficking-in-louisville/*.

[26] https://www.timesunion.com/local/article/Sex-traffic-case-ends-in-plea-5440052.php

- In 2014, a man was arrested by the FBI in Orlando for holding a 15-year-old girl in a Phoenix RRI and selling her for sex. He was later sentenced to 8 years in prison.[27]

- A Mississippi man was arrested in 2014 on human trafficking charges for trafficking a 16-year-old out of a Red Roof Inn in Madison County. He later pled guilty to human trafficking and was sentenced to 25 years in prison.[28]

- In 2015, police arrested 15 men in a sex-with-minors sting at a Red Roof Inn in Woodbury, Wisconsin.[29] The investigation started in 2014 when a man was arrested at the RRI after responding to a Craigslist ad for sex with a 32-year-old and fondling of her deaf daughter.[30]

- In 2016, 2 were charged with human trafficking involving a minor following their arrest at a Red Roof Inn in Louisville, Kentucky.[31]

- In 2016, 2 were charged in a human trafficking scheme after police arrested them at a Red Roof Inn in Jessup, Maryland.[32]

- In 2016, 2 were arrested in New Jersey and accused of running an interstate human trafficking ring out of a Red Roof Inn in Lawrence.[33]

- In 2016, a man was sentenced to ten years for trafficking a 15-year-old girl at two motels, including a Red Roof Inn in Enfield, Connecticut.[34]

- In 2016, a man was sentenced for trafficking a minor at a Red Roof Inn in Rochester, New York for an eight-month period in 2012.[35]

- In 2016, two were arrested on human trafficking charges for forcing a woman into prostitution at an Indiana Red Roof Inn.[36]

---

[27] Jamee Lind, *Phoenix man gets 8 years for selling teen for sex*, The Republic (Mar. 30, 2015), https://www.azcentral.com/story/news/local/phoenix/2015/03/30/phoenix-man-sex-trafficking-sentence-abrk/70691190/.

[28] Mary Grace Eppes, *Man sentenced for human trafficking in Madison Co.*, WLBT3 (Jan. 15, 2015), https://www.wlbt.com/story/27862158/man-sentenced-for-human-trafficking-in-madison-co/.

[29] Mathias Baden, *UPDATE: Police arrest 15 men in sex-with-minors sting at Red Roof Inn*, Republican Eagle (Sept. 23, 2015), https://www.republicaneagle.com/news/public_safety/update-police-arrest-15-men-in-sex-with-minors-sting-at-red-roof-inn/article_e48299f7-e13d-5c86-8e9f-f7faf22a8998.html.

[30] *Id.*

[31] https://www.wave3.com/story/31910401/2-charged-with-human-trafficking-involving-juvenile

[32] https://www.wbaltv.com/article/2-men-charged-in-howard-county-human-trafficking-scheme/7148473#

[33] https://www.trentonian.com/2016/09/01/new-york-man-accused-in-lawrence-sex-rings-boasts-about-600k-manhattan-home/

[34] https://www.courant.com/2016/11/14/hartford-man-sentenced-to-prison-for-sex-trafficking-of-15-year-old-girl/

[35] https://www.democratandchronicle.com/story/news/2016/01/14/rochester-man-sentenced-sex-trafficking/78770804/

[36] https://www.jconline.com/story/news/crime/2016/12/29/court-docs-alleged-pimps-paid-victim-heroin/95952012/

- In 2016, a man was sentenced on human trafficking charges after forcing a woman into prostitution at hotels, including a Red Roof Inn in Massachusetts.[37]

- In 2016, arrests were made after investigation of a human trafficking operation operating out of hotels, including a Red Roof Inn in Illinois.[38]

- In 2016, three were arrested on prostitution charges at a Red Roof Inn in Kentucky.[39]

- In 2017, a man was charged with sex trafficking victims at a Red Roof Inn in Missouri.[40]

- In 2017, there were six arrests following a prostitution bust at a Red Rood Inn in Ohio.[41]

- In 2017, a man pled guilty to sex trafficking a 14-year-old girl at a Red Roof Inn in Kentucky.[42]

- In 2017, twenty-three people were arrested in a human trafficking investigation for trafficking eight girls, between the ages of 14 and 17, at Stockton, California hotels, including the Red Roof Inn.[43]

- In 2017, two were arrested for sex trafficking children, including at a Red Roof Inn in Ohio.[44]

- In 2018, two men were indicted on charges of child sex trafficking after a 15-year-old girl was found at a Red Roof Inn in Delaware.[45]

- In 2018, two were charged for running a sex trafficking operation out of an Illinois Red Roof Inn.[46]

---

[37] https://www.newburyportnews.com/news/man-gets-5-to-8-years-in-prison-for-human-trafficking/article_79f32b03-3e96-5360-af02-76c53e249dec.html
[38] https://www.shawlocal.com/2016/01/18/joliet-hotel-among-meeting-places-in-rappers-sex-trafficking-ring/alh59bo/
[39] https://www.wdrb.com/news/crime-reports/louisville-police-arrest-three-during-undercover-prostitution-investigation/article_12b5448c-2857-5b6b-ba04-0aba80d5b5da.html
[40] https://www.stltoday.com/news/local/crime-and-courts/man-charged-with-sex-trafficking-at-red-roof-inn-in-st-louis/article_4c70ac45-ac34-5d28-bd3c-92efde095381.html
[41] https://www.news5cleveland.com/news/local-news/oh-summit/prostitution-bust-summit-co-investigators-fbi-arrest-six-at-springfield-township-red-roof-inn
[42] https://www.courier-journal.com/story/news/crime/2017/06/07/louisville-man-pleads-guilty-sex-trafficking-14-year-old/377971001/
[43] https://www.kcra.com/article/23-arrested-in-san-joaquin-county-human-trafficking/9588063
[44] https://www.cbs58.com/news/two-pastors-arrested-for-sex-trafficking-children
[45] https://www.acenewstoday.com/two-delaware-men-indicted-on-charges-of-child-sex-trafficking/
[46] https://www.wcia.com/news/local-news/two-people-face-charges-for-involvement-in-trafficking-ring/

- In 2018, a Virginia court upheld a defendant's conviction for sex-trafficking offenses related out of trafficking that occurred at a Virginia Red Roof Inn.[47]

57.    Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of RRI branded properties.

58.    Upon information and belief, each Defendant monitored criminal activity occurring at RRI branded hotels and thus was aware of these incidents and many similar incidents at RRI properties around the country.

59.    Upon information and belief, upper-level executives of the RRI Defendants monitored news stories and law-enforcement reports regarding criminal activity at RRI branded hotels. Upon information and belief, the public relations department for the RRI Defendants would circulate communications among corporate executives discussing criminal activity, including human trafficking and prostitution, at RRI branded properties.

60.    No later than 2013, the RRI Defendants began carefully monitoring online reviews and other customer feedback for RRI branded properties. Indeed, top leadership of the RRI Defendants was "obsessed" with review of customer feedback, including online reviews.[48]

61.    Leadership of the RRI Defendants would receive compiled reviews from Reputology, an online-review aggregator, that compiled reviews for Red Roof Inns all over the country, including the subject locations.[49] RRI Defendants responded to directly or required Franchisee Defendants to respond to reviews posted on review websites.

---

[47] https://caselaw.findlaw.com/court/va-court-of-appeals/1944156.html
[48] https://www.usatoday.com/story/travel/hotels/2013/04/05/red-roof-hotel-outlets/2056817/
[49] https://www.e-marketingassociates.com/blog/use-the-new-hootsuite-reputology-app-to-monitor-online-reviews

62.    Based on information and belief, the Defendants managed and monitored online reviews of RRI hotel locations including the following sample:

- 2007 Tripadvisor review from New Jersey states "This place is a horrible hotel. First, I check in, drop off my luggage, and go get something to eat. I come back to find my room wide open, so I go to the front desk to report it, where i get the "Well, maybe you didnt close the door" and "I'm the only one here, so". The next night, a local prostitute moved in next door and started peddling her wares, so there was traffic all night, and even worse, she was a screamer. So I go to the front desk to report this, where I find the attendant asleep. Don't waste your money here."[50]

- 2008 Expedia review out of California states "Prostitutes were in the local area and were using this hotel for their "business meetings"." [51]

- 2008 Tripadvisor review in Pennsylvania states "This place is not only dirty but it is unsafe. The women of this town must use this hotel as hunting ground. The drug dealers are happy to see anyone check in because the think it is an instant sale. Cops swarm the parking lot continuously. Men walk the halls all hours of the day and night looking for drugs. Hookers walk the halls looking for their next guy. One hooker by the name of "Kimmy" approached my husband and wanted him to pay for sex with her when he refused she with the next available guy. About 2 in the morning she is knocking on our door asking for my husband and wanted him to go party with him. I kicked "Kimmy" out and called the desk. They did nothing. Are the getting a pay off from the drug dealers and hookers?"[52]

- 2008 Expedia review from Ohio states "…To top it off, I am fairly convinced I saw several prostitutes staying there offering thier services to the ODOT workers who were also guests….."[53]

- 2008 Tripadvisor review from Washington states "Hookers passed out in the hall, bathrooms that flooded, topped off by the SWAT team bursting in down the hall at 2 am. This hotel was so dangerous that we complained about the drunk We didn't even have our luggage out of the rental car before two guys got in a screaming fight and ran right past us. It got better a few hours later when a hooker passed out in the hall in front of the room next door and our sleep was interrupted when the SeatTac SWAT team arrived after a dispute between a lady of the evening and a hotel guest

---

[50] https://www.tripadvisor.com/Hotel_Review-g46649-d223813-Reviews-Red_Roof_Inn_Mt_Laurel-Mount_Laurel_New_Jersey.html
[51] https://www.expedia.com/Stockton-Hotels-Red-Roof-Inn-Stockton.h790032.Hotel-Reviews
[52] https://www.tripadvisor.com/Hotel_Review-g30029-d96250-Reviews-Red_Roof_Inn_Allentown_Airport-Allentown_Pennsylvania.html
[53] https://www.expedia.com/Cincinnati-Hotels-Red-Roof-Inn-Cincinnati-Northeast-Blue-Ash.h17551.Hotel-Reviews

that involved a weapon. . . . This is a DANGEROUS place to stay and there is a reason it is cheaper then the other hotels on the same street."[54]

- 2010 Tripadvisor review from Virginia states "For the price you pay, this motel is on of the worst i have seen in this area…What you do get is hallways smelling like marijuana and other illegal drugs. prostitutes renting rooms, drug dealers hanging around the motel, etc. I can't believe that fairfax county police are not aware of these activities. Stay away from this motel if you don't like to expose yourself and your family to such activities mentioned above." [55]

- 2010 Tripadvisor review from South Carolina states "The website lies to you. Nothing but pimps and hookers at this hotel. Had a drunk person knock on our door at 2am then the phone rings someone asking for a woman. No toilet paper. Room was dirty. Never again will I use this hotel chain."[56]

- 2010 Expedia review from California states "We stayed only a few hours. We think this place was being used for a weekend drug and prostitution house, way to many people in and out. Lots of noise and yelling."[57]

- 2011 Yelp review out of Maryland states " This place was close to Washington and we stayed there 5 years ago. How the times have changed, The place reeked of pot smoke and there were hookers in and out of the rooms all night. It must have become some sort of welfare home because families were living there. My second and last night I was woken up by the pimp next door screaming at his girl for not making enough money, he needed to pay for the room and feed her F*^&ing kid who cried in the background. No place to eat near hotel except a Dominos type pizza place and a Chinese restaurant that the Maryland board of health has yet to discover... On a bright note, no one in our group was killed, maybe because of the constant police presence in the parking lot. DO NOT STAY HERE."[58]

- 2011 Tripadvisor review from Kentucky states "We stayed here a few days ago and the young man working the desk was very unprofessional. The whole look of the property was dismal. I am sure it's safe to say that drug dealers and hookers make this their home base. We will never stay at this place again!"[59]

---

[54] https://www.tripadvisor.com/Hotel_Review-g58732-d217798-Reviews-Red_Roof_Inn_Seattle_Airport_SEATAC-SeaTac_Washington.html
[55] https://www.tripadvisor.com/Hotel_Review-g58202-d243757-Reviews-Motel_6_Washington_DC_SW_Springfield-Springfield_Fairfax_County_Virginia.html
[56] https://www.tripadvisor.com/Hotel_Review-g54258-d227066-Reviews-Red_Roof_Inn_Greenville-Greenville_South_Carolina.html
[57] https://www.expedia.com/Stockton-Hotels-Red-Roof-Inn-Stockton.h790032.Hotel-Reviews
[58] https://www.yelp.com/biz/red-roof-inn-washington-dc-laurel-laurel
[59] https://www.tripadvisor.com/Hotel_Review-g39604-d224889-Reviews-Red_Roof_Inn_Louisville_Expo_Airport-Louisville_Kentucky.html

- 2012 TripAdvisor review out of Wisconsin states "I have stayed at this hotel twice a year for nearly 10 years and have never been as disappointed in the hotel as I was this time. It wasn't the room....the room was great....redone....comfy bed....clean. However, the PROBLEM was the other guests. There was a party going on above us with people yelling & cussing all night long. We complained to the front desk and nothing was done. Several suspect prostitutes were coming and going at all hours. The parking lot was LITTERED with strange things such as wigs, beer cans, and condoms."[60]

- 2012 Tripadvisor review from Texas states "I stayed here for a week and it was a miserable experience. The room was ok but the thugs that frequent were always present on the property made for an uneasy time. There were drug deals, prostitutes, and gang type activity on the property. There were a few thugs that tried to intimidate me and I never felt safe the whole time I was staying there. Trust me... Look elsewhere."[61]

- 2012 Tripadvisor review from Michigan states "ABSOLUTELY NEVER STAY HERE - drug dealing and prostitution rife at hotel."[62]

- 2013 Tripadvisor review from California states "…Because of our road trip we didn't arrive until 10 pm that night when we arrived there were about 5 prostitutes outside with pimps. We were so frightened we drove around for 30 minutes trying to cancel our stay and because it was after 6 pm they wouldn't allow us to cancel. I'm positive the owner has some sort of deal with the drug dealers and pimps there is no way he doesn't know this is going on. They don't even try to hide it!..."[63]

- 2013 Tripadvisor review from Mississippi states "…If you are looking to have a beer with any of the vaqueros standing on each corner of the motel at all hours of day or night, this is the place for you. If you wish easy access to a prostitute down the hall, this is the place for you. If you desire a tattoo from the guy next door who just got out of prison, this is the place for you…"[64]

- 2013 Tripadvisor review from North Carolina states "Stayed here this past weekend and had to change rooms 3 times. The inappropriate activities at this hotel were

---

[60] https://www.tripadvisor.com/Hotel_Review-g60149-d123051-Reviews-Red_Roof_Inn_Milwaukee_Airport-Oak_Creek_Wisconsin.html

[61] https://www.tripadvisor.com/Hotel_Review-g56003-d223173-Reviews-Red_Roof_Inn_Houston_Westchase-Houston_Texas.html

[62] https://www.tripadvisor.com/Hotel_Review-g42207-d235115-Reviews-Red_Roof_Inn_Flint_Bishop_Airport-Flint_Michigan.html

[63] https://www.tripadvisor.co/Hotel_Review-g33130-d231069-Reviews-Red_Roof_Inn_Stockton-Stockton_California.html

[64] https://www.tripadvisor.com/Hotel_Review-g43833-d225211-Reviews-Red_Roof_Inn_Jackson_Downtown_Fairgrounds-Jackson_Mississippi.html

horrendous. Prostitutes, dogs everywhere, drug deals and a fight in the parking lot. Would never stay again."[65]

- 2013 Yelp review from Virginia states "Honestly i would have given a 1 star but i have to give an extra star for the honesty of the woman there who adamantly admitted that there are lots of prostitutes that stay there.hey at least she was honest about it."[66]

- 2013 Tripadvisor review from Florida states "….The corporate office, regional, and general managers WILL be receiving very detailed letters INCLUDING information pertaining to the police department being called because of drug activity AND CONCUBINES/PROSTITUTES as well as the PEDDLERS asking hotel guests for money. THE WORST HOTEL IVE EVER STAYED AT."[67]

- 2014 Tripadvisor review from Oklahoma states "…. Random meth heads, hookers, and undesirables roaming the property ALL night. Literally all night."[68]

- 2014 Expedia review from Ohio states "…also prostitution going on every dang night along with drug deals in parking lot…"[69]

- 2014 Expedia review from North Carolina states "Great place if you need a hooker or drugs. Never again. Pimps running there girls in and out all night. Two domestic disputes during the night. Got no sleep."[70]

- 2014 Expedia review from California states "It was like out of a movie with all the hookers, and pimps out front. . . ."[71]

- 2014 Expedia review from North Carolina states "No security at this Hotel, and there was a lot of traffic coming in and out of the parking lot all hours of the evening. A lot of undesirables hanging around, pimps and drug dealers. There are some whom set up a porch by their doors indicating that they are living there for extended stays."[72]

---

[65] https://www.tripadvisor.com/Hotel_Review-g49673-d94900-Reviews-Red_Roof_Inn_Wilmington_NC-Wilmington_North_Carolina.html
[66] https://www.yelp.com/biz/red-roof-plus-washington-dc-alexandria-alexandria-2
[67] https://www.tripadvisor.com/Hotel_Review-g34550-d226822-Reviews-or40-Red_Roof_Inn_Pensacola_I_10_at_Davis_Highway-Pensacola_Florida.html
[68] https://www.tripadvisor.com/Hotel_Review-g51560-d224966-i80249747-Red_Roof_Inn_Oklahoma_City_Airport-Oklahoma_City_Oklahoma.html
[69] https://www.expedia.com/Columbus-Hotels-Red-Roof-Inn-Columbus-Ohio-State-Fairgrounds.h450037.Hotel-Reviews
[70] https://www.expedia.com/Wilmington-Hotels-Red-Roof-Inn-Wilmington.h14416.Hotel-Reviews
[71] https://www.expedia.com/Stockton-Hotels-Red-Roof-Inn-Stockton.h790032.Hotel-Reviews
[72] https://www.tripadvisor.com/Hotel_Review-g49673-d94900-Reviews-Red_Roof_Inn_Wilmington_NC-Wilmington_North_Carolina.html

- 2015 Tripadvisor review from Missouri states "The scariest of all was definitely when I came across a scene of what appeared a prostitute kneeling and crying in the parking lot while a pimp was yelling at her. Management should look into that."[73]

- 2016 Expedia review from Ohio states "Absolutely terrible. Drugs everywhere, prostitutes. Just not a good hotel."[74]

- 2016 Tripadvisor review from Virginia states "…Prostitutes work out of this hotel. I would never stay here again."[75]

- 2016 review from Ohio states "Hookers everywhere…not a safe place to bring the wife & kids that's for sure."[76]

- 2015 Yelp review from Ohio states "They give pimps discounts and the strippers from Christie's cabaret stay here almost exclusively. So there is a lot of drug activity and whores."[77]

- 2016 review from Tripadvisor from Texas states "I have to imagine it would be a very reasonably priced casual encounter as well... Let's just say that the pimps were easy to ID and the women standing in the doorways with almost nothing on reminded me of a visit to Amsterdam in my youth. The room was nice enough, but this is quite possibly the most sketchy neighborhood I've ever had a hotel in outside of Europe's Redlight districts."[78]

- 2017 Expedia review from Ohio states "…we checked in early at like 3 pm, but when the sun went down omg !! all the prostitutes started showing up! I was so embarrassed having to explain to my 6 year old daughter why these women were dressed that way!!!"[79]

- 2017 Google review from Ohio states "There are prostitutes in this hotel. A pimp was outside bleeding. Police were called. He was shot."[80]

---

[73] https://www.tripadvisor.com/Hotel_Review-g44881-d224932-Reviews-or10-Red_Roof_Inn_Plus_St_Louis_Forest_Park_Hampton_Avenue-Saint_Louis_Missouri.html
[74] https://www.expedia.com/Dayton-Hotels-Red-Roof-Inn-Dayton-North-Airport.h10480.Hotel-Reviews
[75] https://www.tripadvisor.com/Hotel_Review-g58277-d225059-Reviews-Red_Roof_Inn_Virginia_Beach-Virginia_Beach_Virginia.html#REVIEWS
[76] https://www.expedia.com/Dayton-Hotels-Red-Roof-Inn-Dayton-North-Airport.h10480.Hotel-Reviews
[77] https://www.yelp.com/biz/red-roof-inn-canton-north-canton-2
[78] https://www.tripadvisor.com.au/Hotel_Review-g56003-d1577352-Reviews-or40-Red_Roof_Inn_Houston_North_FM1960_I_45-Houston_Texas.html
[79] https://www.expedia.com/Columbus-Hotels-Red-Roof-Inn-Columbus-East-Reynoldsburg.h20658.Hotel-Reviews
[80]https://www.google.com/travel/hotels/Red%20Roof%20Inn%205900%20Pfeiffer%20Rd,%20Blue%20Ash,%20OH%2045242%20google/entity/CgsIpv7r-N3htczhARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4810792,4810794,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906019,4926165,4926489,4930751,4930752,4931360,4936396,4937897,4938634,4938636,47061553&hl=en-

- 2017 Tripadvisor review from Texas states "Two words - NEVER AGAIN! During check in we were skipped for a 2 hour prostitution sale, her pimp propositioned my husband and son in the parking lot for drugs and sale of prostitution. We did not feel safe nor comfortable the entire 2 days we were there."

- 2018 Expedia review from Ohio states "…There were also at least 2 hookers walking around soliciting. We also watched/heard 2 men argue outside, to the point I was afraid someone was going to end up hurt…"[81]

- 2019 Yelp review from Ohio states "…The hotel/motel really, it became obvious this was a live in hotel for some which happens, but it became apparent there was prostitution happening here and it was very very unnerving I was more concerned of the persons moving about the hotel at no discretion of the place . The hotel had more shady people milling about no security. There were unsavory things going's on "hired persons" if you will…"[82]

- 2019 Expedia review from Ohio states  "Cons: Omg! Prostitution happening here. Prostitutes hanging out of their doors even solicited a family member. Shady people. Banging on doors middle of the night. This is what you get for the price…"[83]

63.    This sampling of news stories, reviews, and other public information establishes

that, at the time K.D. was trafficked at the subject property, the RRI Defendants knew or should

have known that:

a.  There was widespread and ongoing sex trafficking occurring at RRI branded properties.

b.  Sex trafficking was a brand-wide problem for RRI originating from management level decisions at their corporate offices in Ohio.

c.  RRI franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

US&gl=us&ssta=1&q=Red+Roof+Inn+5900+Pfeiffer+Rd,+Blue+Ash,+OH+45242+google&grf=EmQKLAgOEigSJ
nIkKiIKBwjnDxACGA4SBwjnDxACGA8gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4ND
A1M2VjNDY2NjhiZWQ6MHHlMTk4ZDcwZGRmMWFmZjI2&rp=EKb-6_jd4bXM4QEQpv7r-
N3htczhATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwiqqPCyxvH8AhUgQzABHT-DCyEQ4gl6BAhrEAU
[81] https://www.expedia.com.tw/en/Cincinnati-Hotels-Red-Roof-Inn-Cincinnati-East-Beechmont.h25044.Hotel-
Reviews
[82] https://www.yelp.com/biz/red-roof-inn-cleveland-airport-middleburg-heights-middleburg-heights
[83] https://www.expedia.com/Dayton-Hotels-Red-Roof-Inn-Dayton-North-Airport.h10480.Hotel-Reviews

d. RRI's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

e. RRI and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

64. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, the RRI Defendants continued to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**IV. K.D.'s Trafficking at the Amarillo Red Roof Inn.**

65. Between 2013 and 2018, K.D. was repeatedly trafficked at the Amarillo Red Roof Inn. Both of her traffickers brought her to this hotel, where they coerced and/or forced her to engage in commercial sex acts there for their financial benefit for days at a time.

66. K.D.'s traffickers elected to use Amarillo Red Roof Inn to traffic K.D. because it was known as a location that was conducive to criminal activity, and they understood that hotel staff would turn a blind eye to sex trafficking activity and that the hotels policies and practices would make it easy for them to operate.

**A. USA Lodging knew or should have known about sex trafficking at the Amarillo Red Roof Inn, including K.D.'s trafficking.**

67. Prior to and during K.D.'s trafficking at the Amarillo Red Roof Inn, USA Lodging knew or should have known that sex trafficking and related criminal activity was prevalent at the Amarillo Red Roof Inn because, on information and belief, there was widespread trafficking activity on site that followed well-established patterns and presented with obvious signs that USA Lodging knew or was on notice were "red flags" of sex trafficking.

68.    Amarillo law enforcement has recognized that the Amarillo Red Roof Inn has a "reputation for frequent illegal activity on its premises" and is a "known crime haven."[84]

69.    On information and belief, traffickers repeatedly chose to use the Amarillo Red Roof Inn for their illegal activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Amarillo Red Roof Inn and there were "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

70.    Online reviews corroborate that the presence of sex trafficking and related criminal activity was open and obvious at the Amarillo Red Roof Inn on an ongoing basis, including:

- Yelp review from July 29, 2019 the customer wrote, "100% sure drug deals and possibly prostitution went on in the parking lot and other rooms. We also heard fighting which spilled out into the courtyard, though fortunately this was about 9am, not during sleeping hours. I will say it was actually pretty quiet at night, which makes me suspect illegal activity all the more, trying to avoid having the cops called.Definitely some meth addicts staying here as well, faces all scabbed up." [85]

- Expedia review from July 22, 2020 the customer wrote, "The freah cigarette smoke in the non-smoking room, the 2 broken beds, the prostitutes and drug dealers outside my door, and the bugs made sleep impossible. Not a safe area, saw several girls "working" while we waited for my husband to check in. They even approached our room. No -refundable so we stayed but we did not feel safe." [86]

---

[84] *United States v. Speaks*, 2025 LX 471580, at *4 (N.D. Tex. Oct. 6, 2025).

[85] Red Roof Inn – Reviews – 6800 I-40 Frontage Rd, Amarillo, TX 79106 – Yelp, https://www.yelp.com/biz/red-roof-inn-amarillo-west-amarillo-2
[86]    Red Roof Inn – Reviews – 6800 I-40 Frontage Rd, Amarillo, TX 79106 – Expedia, https://www.expedia.com/Amarillo-Hotels-Red-Roof-Inn-Amarillo-West.h4221.Hotel-Reviews

- Expedia review from March 17, 2021 the customer wrote, "This was definitely a shady establishment. Signs all over stating that Amarillo residents were not allowed to stay which means in the past there has been a drug or prostitution problem. The drywall was falling off the ceiling from an old water leak and the comforter had multiple large cigarette burns in it and this was a no smoking room. Keep on driving and find something else." [87]

- Booking review from July 28, 2021 the customer wrote, " In the entry there was a sign which said they do not rent to locals.. I should have realized what that meant and walked away at that point. Now I feel like it was used a prostitute hotel. Family members had highly recommended Red Roof because they had stayed in them in other states. It was a shock and disappointment to all three of us." [88]

- Booking review from August 10, 2021 the customer wrote, "If you are into local prostitution and drugs, then you found the right spot."[89]

71.    While K.D. was trafficked at the Amarillo Red Roof Inn she observed other women being trafficked at the hotel. When M. trafficked her at this hotel, he trafficked other victims there at the same time. In addition, M. also saw obvious signs of other traffickers operating at this hotel, including one known to her to be an acquaintance of M.

72.    There were numerous, obvious "red flags" specific to K.D.'s trafficking at the Amarillo Red Roof Inn.

73.    K.D.'s traffickers were frequently present at the Amarillo Red Roof Inn and regularly lingered in the parking lot and other common areas to monitor activity while K.D. was in the room seeing johns. Staff members would have had an opportunity to observe this while performing their ordinary job duties and monitoring the premises.

---

[87]  Red Roof Inn – Reviews – 6800 I-40 Frontage Rd, Amarillo, TX 79106 - Expedia, https://www.expedia.com/Amarillo-Hotels-Red-Roof-Inn-Amarillo-West.h4221.Hotel-Reviews
[88]  Red Roof Inn – Reviews – 6800 I-40 Frontage Rd, Amarillo, TX 79106 – Booking, https://www.booking.com/hotel/us/quality-inn-suites-west-amarillo- texas.es.html
[89] Red Roof Inn – Reviews – 6800 I-40 Frontage Rd, Amarillo, TX 79106 – Booking, https://www.booking.com/hotel/us/quality-inn-suites-west-amarillo-texas.es.html

74.      K.D.'s traffickers would sometimes use fake IDs and prepaid cards to book the rooms, and the booking names often wouldn't match the ID being used. On some occasions, a john would book the rooms for one night then K.D.'s traffickers would extend bookings for additional nights.

75.      Because K.D.'s traffickers kept her dependent on drugs as a means of control, she was often visibly impaired while at the Amarillo Red Roof Inn. Staff members would have had an opportunity to observe this while K.D. was in common areas. Housekeeping staff also would have had an opportunity to observe this during interactions with K.D.

76.      There were obvious signs of drug use in the rooms where K.D. and other victims were being trafficked, which would have been apparent to staff performing routine duties.

77.      There was a heavy flow of johns to and from the rooms where K.D. and other victims were being trafficked. T. would require K.D. to see about 15 johns each day, while M. would require her to see between 10 and 15. M. was also trafficking other victims at the Amarillo Red Roof Inn at the same time as K.D., which added to the volume of this traffic. This traffic consisted of men who were not registered hotel guests, had no luggage, and stayed for short periods before leaving again. Staff members would have had an opportunity to observe this while performing their ordinary job duties and monitoring the premises.

78.      When K.D. and other victims arrived at the hotel, moved through common areas, or exited the property, hotel staff observed them dressed in highly provocative clothing. Housekeeping staff also observed them in this attire when entering the rooms to perform their duties.

79.      Extra towels and linens were requested on a daily basis to accommodate the high volume of commercial sex activity. These requests were made to housekeeping staff in the hallways and to front-desk staff at the hotel office..

80.     There were other signs detectable to staff that arose from the *modus operandi* that T. and M. used when trafficking K.D. across many hotels, including the Amarillo Red Roof Inn.

81.     These "red flags" manifested in ways such that there were readily observable by the hotel staff in the normal course of performing their duties. On information and belief, multiple employees at the Amarillo Red Roof Inn observed, or were made aware of these obvious signs of K.D.'s trafficking while acting within the scope of their employment.

82.     Staff and management at the Amarillo Red Roof Inn made comments reflecting their knowledge of the illegal trafficking activities occurring at the hotel but nonetheless continued to provide rooms for that activity. On one occasion, while M. was trafficking K.D. and another victim at the Amarillo Red Roof Inn, bed bugs were discovered in the room they were renting. When they contacted the front desk to complain and request a refund, a male hotel employee—whom K.D. understood to be the manager or owner—came to the room visibly angry. He refused to issue a refund and stated that he knew what was going on and should call the police. Despite this acknowledgment, he did not contact law enforcement. Instead, M. was permitted to continue renting rooms at the Amarillo Red Roof Inn and to traffic K.D. and the other victim there, with the hotel's only expressed concern being that it would not lose revenue from their stay.

83.     The manager at the Amarillo Red Roof Inn would make flirtatious comments to other girls and I, making it clear he knew about the commercial sex activity happening in his hotel, yet doing nothing about it.

84.     The knowledge and observations of staff at the Amarillo Red Roof Inn are imputed to USA Lodging, which employed and controlled those employees. Through staff members' direct interactions with K.D. and her traffickers, USA Lodging knew or, at a minimum, should have

known of the widespread and ongoing trafficking at the Amarillo Red Roof Inn, including the trafficking of K.D.

85.     Upon information and belief, USA Lodging also knew or should have known of the sex-trafficking activity occurring at the Amarillo Red Roof Inn, including the trafficking of K.D., based on information obtained through:

   a.     surveillance of the property;
   b.     internal investigations or incident reviews;
   c.     inspections of the property;
   d.     guest complaints;
   e.     monitoring of guest feedback; and
   f.     information received from law enforcement.

86.     USA Lodging is charged with constructive knowledge of this trafficking at the Amarillo Red Roof Inn because the indicators of trafficking were sufficiently obvious, frequent, and pervasive that they would have been detected by a reasonably prudent hotel operator under the circumstances, particularly in light of the well-known risk of sex trafficking in hotel.

87.     USA Lodging is also charged with constructive knowledge of this trafficking at the Amarillo Red Roof Inn because it failed to exercise reasonable diligence in response to the known problem of sex trafficking and the heightened risk of trafficking and associated criminal activity at the Amarillo Red Roof Inn.

**B.  USA Lodging benefited by facilitating K.D.'s sex trafficking.**

88.     USA Lodging, which owned and operated the Amarillo Red Roof Inn through the Red Roof franchising system, was engaged in a commercial enterprise involving the rental of rooms and provision of hotel services at that property. USA Lodging knew or should have known that this commercial enterprise was facilitating sex trafficking, including the trafficking of K.D.

89.     USA Lodging knowingly benefited, financially and otherwise, from its participation in this commercial enterprise.

90.     Each time a room was rented at the Amarillo Red Roof Inn, USA Lodging received revenue from the room rental and associated services. USA Lodging thus received a direct financial benefit when traffickers used its hotel rooms to traffic K.D. and other victims.

91.     USA Lodging knew or should have known that it was operating the Amarillo Red Roof Inn in a manner that made it easier for criminal activity, including sex trafficking, to occur and that, by doing so, it attracted business from sex traffickers and others engaged in illegal activity.

92.     Despite repeated and obvious red flags of sex trafficking, USA Lodging continued to rent rooms, provide services, and otherwise facilitate use of the hotel by traffickers, including K.D.'s traffickers.

93.     USA Lodging formed and maintained business relationships with traffickers operating at the Amarillo Red Roof Inn, including K.D.'s traffickers. These relationships involved a mutual pursuit of financial benefit: traffickers rented rooms to generate proceeds from sex trafficking, while USA Lodging profited from the repeated rental of rooms and provision of hotel services.

94.     Through its actions and omissions, USA Lodging developed an implicit understanding with traffickers operating at the Amarillo Red Roof Inn, including K.D.'s traffickers. This understanding arose because traffickers repeatedly used the Amarillo Red Roof Inn knowing that staff would look the other way and that the practices and environment at the Amarillo Red Roof Inn would allow them to operate with minimal risk of disruption by staff, detection by law enforcement, or future traceability.

95.     This implicit understanding is evidenced by the fact that both of K.D.'s traffickers independently selected the Amarillo Red Roof Inn as a location to traffic her, as well as by the constant and obvious signs of other trafficking activity that K.D. observed at the hotel.

96.     This implicit understanding was reinforced when hotel management made comments confirming knowledge of the illegal activity occurring but taking no steps to address it and, instead, only emphasizing payment for the room.

97.     USA Lodging continued to renew its business relationship with these traffickers even after it knew or should have known that doing so was facilitating trafficking.

98.     USA Lodging facilitated sex trafficking at the Amarillo Red Roof Inn by operating the hotel in ways that made trafficking easier, including by:

    a.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of K.D. and other victims;

    b.  implementing inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff with respect to trafficking, criminal activity, and hotel security;

    c.  disregarding widely availble resources for educating hotel staff on how to detect sex trafficking and failing to implement or enforce adequate sex-trafficking education and training for hotel staff;

    d.  creating an environment that implicitly encouraged traffickers by allowing them to operate openly without the need to take significant steps to conceal their activities;

    e.  allowing unrestricted and untracked access to the hotel by a high volume of commercial sex buyers without monitoring, restricting, or documenting their presence; and

    f.  adopting operational policies and practices that were known to facilitate sex trafficking while disregarding established industry knowledge about policies and practices known to deter and detect sex trafficking and related criminal activity.

**V.     K.D.'s Trafficking at the Lubbock Red Roof Inn**

99.     Between 2013 and 2018, K.D. was repeatedly trafficked at the Lubbock Red Roof Inn. Both of her traffickers brought her to this hotel on repeated occasions, where they coerced

and/or forced her to engage in commercial sex acts there for their financial benefit for days at a time. This was the last hotel that K.D. was trafficked at before M. took her to the hotel where she made her final escape from him.

100.    K.D.'s traffickers elected to use Lubbock Red Roof Inn to traffic K.D. because it was known as a location that was conducive to criminal activity, and they understood that hotel staff would turn a blind eye to sex trafficking activity and that the hotels policies and practices would make it easy for them to operate. M. developed a familiar and flirtatious relationship a female staff member at the Lubbock Red Roof Inn, which further reinforced his understanding that he could traffic K.D. and other victims at this property without inference.

A. **Ishvarpremi knew or should have known about sex trafficking at the Lubbock Red Roof Inn, including K.D.'s trafficking.**

101.    Before and after K.D.'s trafficking, Ishvarpremi knew or should have known that sex trafficking and related criminal activity was prevalent at the Lubbock Red Roof Inn because, on information and belief, there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that Ishvarpremi was on notice were "red flags" of sex trafficking.

102.    The Lubbock Red Roof Inn was in a high-crime area.

103.    On information and belief, traffickers repeatedly chose to use the Lubbock Red Roof Inn for their illegal activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Lubbock Red Roof Inn and there were "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out

of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

104.    News articles corroborate the presence of this illegal activity at the Lubbock Red Roof Inn. In 2013, multiple arrests resulted from a sting operation at the Lubbock Red Roof Inn, which included the recovery of two minor victims of sex trafficking.[90]

105.    Online reviews also corroborate that the presence of sex trafficking and related criminal activity was open and obvious at the Lubbock Red Roof Inn on an ongoing basis, including:

> • TripAdvisor review from September 6, 2012 the customer wrote, "Unless you wish to be greated by HOOKERS in the lobby, 40's and other alcohol bottles in the halls. SCARRY!!!! Place to be. We paid for two nights but after lugging our bags up to stairway that smelled like PEE because the elevator was broke, we decided that this really wasn't the safest place for our family to be. The whole place smells like cigarette smoke. Very unclean, even the halls big black dirty stains. WORST HOTEL I'VE EVER STAYED, WELL ALMOST STAYED AT IN MY LIFE!!!!!!! I give this hotel a -5 in rating" [91]

> • Trip Advisor review from May 28, 2013 the customer wrote, "Don't be mislead by others, this "hotel" is scary! I looked at a total of 3 rooms before deciding we would go elsewhere. It is filthy and the mattresses were old and sunk in. The staff couldn't have cared less about anything, and I suspect the people who were actually staying there were either drug dealers, pimps or prostitutes." [92]

> • TripAdvisor review from February 22, 2015 the customer wrote, "If you work hard for a better standard of living and you love your kids....You don't want to stay here!!!! Junkies,Parolees and Prostitutes.Garbage piled up in the hallway Drug abusers being thrown out into the hallway,This is no exaggeration!! The

---

[90] https://www.kcbd.com/story/23272377/4-charged-with-prostitution-offenses-after-red-roof-inn-sting/
[91] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Trip Advisor,
https://www.tripadvisor.com/Hotel_Review-g56208-d1462022-Reviews-
Red_Roof_Inn_Conference_Center_Lubbock-Lubbock_Texas.html
[92] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Trip Advisor,
https://www.tripadvisor.com/Hotel_Review-g56208-d1462022-Reviews-
Red_Roof_Inn_Conference_Center_Lubbock-Lubbock_Texas.html

staff at the front desk were decent but I think it's probably to the point where the inmates are running the prison." [93]

• TripAdvisor review from March 12, 2016 the customer wrote, "Pretty sure there was a prostitute out back talking to every man that came out there." [94]

• Booking review from May 31, 2021 the customer wrote, "Had dope fiends walking around all night. Prostitutes actually solicited me both days." [95]

• Booking review from September 16, 2022 the customer wrote, "Staff break the rules more than the customers. Staff selling and doing drugs." [96]

• Booking review from March 25, 2022 the customer wrote, "Positive: Nothing|Negative: Everything. The vibe made me feel as if it was a hotel for sex trafficking." [97]

• Booking review from  April 11, 2022 the customer wrote, "Positive: Nothing|Negative: It constantly reeked of marijuana . . . there were homeless people wandering the parking lot, and actual prostitutes leaving the property and openly being paid." [98]

---

[93] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Trip Advisor, https://www.tripadvisor.com/Hotel_Review-g56208-d1462022-Reviews-Red_Roof_Inn_Conference_Center_Lubbock-Lubbock_Texas.html

[94] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Trip Advisor, https://www.tripadvisor.com/Hotel_Review-g56208-d1462022-Reviews-Red_Roof_Inn_Conference_Center_Lubbock-Lubbock_Texas.html

[95] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Booking, https://www.booking.com/hotel/us/red-roof-inn-and-conference-center-lubbock.en-gb.html?aid=356980&label=gog235jc-1DCAso7AFCKnJlZC1yb29mLWlubi1hbmQtY29uZmVyZW5jZS1jZW50ZXItbHViYm9ja2gzWANotQGIAQGYAQm4ARflAQzYAQPoAQGIAgGoAgO4Ao7C9J4GwAIB0gIkN2E2MDVjZTMtZjJkNi00ZDNlLWIyZDMtZTM1ZGIxZmQ0MzAy2AIE4AIB&dist=0

[96] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Booking, https://www.booking.com/hotel/us/red-roof-inn-and-conference-center-lubbock.en-gb.html?aid=356980&label=gog235jc-1DCAso7AFCKnJlZC1yb29mLWlubi1hbmQtY29uZmVyZW5jZS1jZW50ZXItbHViYm9ja2gzWANotQGIAQGYAQm4ARflAQzYAQPoAQGIAgGoAgO4Ao7C9J4GwAIB0gIkN2E2MDVjZTMtZjJkNi00ZDNlLWIyZDMtZTM1ZGIxZmQ0MzAy2AIE4AIB&dist=0

[97] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Booking, https://www.booking.com/hotel/us/red-roof-inn-and-conference-center-lubbock.en-gb.html?aid=356980&label=gog235jc-1DCAso7AFCKnJlZC1yb29mLWlubi1hbmQtY29uZmVyZW5jZS1jZW50ZXItbHViYm9ja2gzWANotQGIAQGYAQm4ARflAQzYAQPoAQGIAgGoAgO4Ao7C9J4GwAIB0gIkN2E2MDVjZTMtZjJkNi00ZDNlLWIyZDMtZTM1ZGIxZmQ0MzAy2AIE4AIB&dist=0&group_adults=2&keep_landing=1&sb_price_type=total&type=total&

[98] Red Roof Inn – Reviews – 6624 I-27, Lubbock, TX 79404 – Booking, https://www.booking.com/hotel/us/red-roof-inn-and-conference-center-lubbock.en-gb.html?aid=356980&label=gog235jc-1DCAso7AFCKnJlZC1yb29mLWlubi1hbmQtY29uZmVyZW5jZS1jZW50ZXItbHViYm9ja2gzWANotQGIAQGYAQm4ARflAQzYAQPoAQGIAgGoAgO4Ao7C9J4GwAIB0gIkN2E2MDVjZTMtZjJkNi00ZDNlLWIyZDMtZTM1ZGIxZmQ0MzAy2AIE4AIB&dist=0&group_adults=2&keep_landing=1&sb_price_type=total&type=total&

106.    While K.D. was trafficked at the Lubbock Red Roof Inn, she observed other women being trafficked at the property, including additional victims trafficked by M. during the same period, as well as widespread signs of other trafficking and related criminal activity. She observed older traffickers with girls who appeared significantly younger, witnessed an altercation involving a pimp in the parking lot, and repeatedly observed obvious signs of drug activity and other fights at the hotel. These conditions were open and obvious to K.D. and would have been apparent to front-desk, housekeeping, and maintenance staff in the normal course of their duties. Yet, K.D. never observed hotel staff intervene in this activity, and the same conditions persisted each time she returned to the Lubbock Red Roof Inn.

107.    There were numerous, obvious "red flags" specific to K.D.'s trafficking at the Lubbock Red Roof Inn.

108.    K.D.'s traffickers were frequently present at the Lubbock Red Roof Inn and regularly lingered in the parking lot and other common areas to monitor activity while K.D. was in the room seeing johns. Staff members would have had an opportunity to observe this while performing their ordinary job duties and monitoring the premises.

109.    K.D.'s traffickers would sometimes use fake IDs and prepaid cards to book the rooms, and the booking names often wouldn't match the ID being used. On some occasions, a john would book the rooms for one night then K.D.'s traffickers would extend bookings for additional nights.

110.    Because K.D.'s traffickers kept her dependent on drugs as a means of control, she was often visibly impaired while at the Lubbock Red Roof Inn. Staff members would have had an opportunity to observe this while K.D. was in common areas. Housekeeping staff also would have had an opportunity to observe this during interactions with K.D.

111.    When one of M.'s other victims was using the room, M. often required K.D. to wait in the common areas of the hotel so that he could monitor her. During these times, hotel staff regularly saw K.D. waiting under M.'s supervision, and K.D. observed M. interacting with hotel staff. In particular, a female employee at the Lubbock Red Roof Inn maintained a friendly and flirtatious relationship with M., and K.D. frequently observed them interacting while she was required to wait in the hotel's common areas.

112.    There were obvious signs of drug use in the rooms where K.D. and other victims were being trafficked, which would have been apparent to staff performing routine duties.

113.    There was a heavy flow of johns to and from the rooms where K.D. and other victims were being trafficked. T. would require K.D. to see about 15 johns each day, while M. would require her to see between 10 and 15. M. was also trafficking other victims at the Lubbock Red Roof Inn at the same time as K.D., which added to the volume of this traffic. This traffic consisted of men who were not registered hotel guests, had no luggage, and stayed for short periods before leaving again. Staff members would have had an opportunity to observe this while performing their ordinary job duties and monitoring the premises.

114.    When K.D. and other victims arrived at the hotel, moved through common areas, or exited the property, hotel staff observed them dressed in highly provocative clothing. Housekeeping staff also observed them in this attire when entering the rooms to perform their duties.

115.    Extra towels and linens were requested on a daily basis to accommodate the high volume of commercial sex activity. These requests were made to housekeeping staff in the hallways and to front-desk staff at the hotel office.

116.    K.D. had repeated interactions with housekeeping staff at the Lubbock Red Roof Inn. Through their words and conduct, these staff members made clear that they were aware of the

nature of the activity occurring in the room. They were openly hostile toward K.D. and the other victims, acted with visible disgust, attempted to avoid entering the room, and instead threw trash bags and clean linens toward the occupants rather than providing normal housekeeping services.

117.    K.D. heard housekeeping staff make comments indicating awareness of the activity occurring in the room. Despite this apparent awareness, the staff did not take any steps to stop or report the illegal activity and instead treated K.D. and the other victims with hostility and disrespect.

118.    There were other signs detectable to staff that arose from the *modus operandi* that T. and M. used when trafficking K.D. across many hotels, including the Lubbock Red Roof Inn.

119.    These "red flags" manifested in ways such that there were readily observable by the hotel staff in the normal course of performing their duties. On information and belief, multiple employees at the Lubbock Red Roof Inn observed, or were made aware of these obvious signs of K.D.'s trafficking while acting within the scope of their employment.

120.    The knowledge and observations of staff at the Lubbock Red Roof Inn are imputed to Ishvarpremi, which employed and controlled those employees. Through staff members' direct interactions with K.D. and her traffickers, Ishvarpremi knew or, at a minimum, should have known of the widespread and ongoing trafficking at the Lubbock Red Roof Inn, including the trafficking of K.D.

121.    Upon information and belief, Ishvarpremi also knew or should have known of the sex-trafficking activity occurring at the Lubbock Red Roof Inn, including the trafficking of K.D., based on information obtained through:

     a.     surveillance of the property;
     b.     internal investigations or incident reviews;
     c.     inspections of the property;
     d.     guest complaints;
     e.     monitoring of guest feedback; and
     f.     information received from law enforcement.

122.    Ishvarpremi is charged with constructive knowledge of this trafficking at the Lubbock Red Roof Inn because the indicators of trafficking were sufficiently obvious, frequent, and pervasive that they would have been detected by a reasonably prudent hotel operator under the circumstances, particularly in light of the well-known risk of sex trafficking in hotel.

123.    Ishvarpremi is also charged with constructive knowledge of this trafficking at the Lubbock Red Roof Inn because it failed to exercise reasonable diligence in response to the known problem of sex trafficking and the heightened risk of trafficking and associated criminal activity at the Lubbock Red Roof Inn.

**B.  Ishvarpremi benefited by facilitating K.D.'s sex trafficking.**

124.    Ishvarpremi, which owned and operated the Lubbock Red Roof Inn through the Red Roof franchising system, was engaged in a commercial enterprise involving the rental of rooms and provision of hotel services at that property. Ishvarpremi knew or should have known that this commercial enterprise was facilitating sex trafficking, including the trafficking of K.D.

125.    Ishvarpremi knowingly benefited, financially and otherwise, from its participation in this commercial enterprise.

126.    Each time a room was rented at the Lubbock Red Roof Inn, Ishvarpremi received revenue from the room rental and associated services. Ishvarpremi thus received a direct financial benefit when traffickers used its hotel rooms to traffic K.D. and other victims.

127.    Ishvarpremi knew or should have known that it was operating the Lubbock Red Roof Inn in a manner that made it easier for criminal activity, including sex trafficking, to occur and that, by doing so, it attracted business from sex traffickers and others engaged in illegal activity.

128.    Despite repeated and obvious red flags of sex trafficking, Ishvarpremi continued to rent rooms, provide services, and otherwise facilitate use of the hotel by traffickers, including K.D.'s traffickers.

129.    Ishvarpremi formed and maintained business relationships with traffickers operating at the Lubbock Red Roof Inn, including K.D.'s traffickers. These relationships involved a mutual pursuit of financial benefit: traffickers rented rooms to generate proceeds from sex trafficking, while Ishvarpremi profited from the repeated rental of rooms and provision of hotel services.

130.    Through its actions and omissions, Ishvarpremi developed an implicit understanding with traffickers operating at the Lubbock Red Roof Inn, including K.D.'s traffickers. This understanding arose because traffickers repeatedly used the Lubbock Red Roof Inn knowing that staff would look the other way and that the practices and environment at the Lubbock Red Roof Inn would allow them to operate with minimal risk of disruption by staff, detection by law enforcement, or future traceability.

131.    This implicit understanding is evidenced by the fact that both of K.D.'s traffickers independently selected the Lubbock Red Roof Inn as a location to traffic her, as well as by the constant and obvious signs of other trafficking activity that K.D. observed at the hotel.

132.    This implicit understanding was reinforced when hotel management made comments confirming knowledge of the illegal activity occurring but taking no steps to address it and, instead, only emphasizing payment for the room.

133.    Ishvarpremi continued to renew its business relationship with these traffickers even after it knew or should have known that doing so was facilitating trafficking.

134.    Ishvarpremi facilitated sex trafficking at the Lubbock Red Roof Inn by operating the hotel in ways that made trafficking easier, including by:

a.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of K.D. and other victims;

b.  implementing inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff with respect to trafficking, criminal activity, and hotel security;

c.  disregarding widely available resources for educating hotel staff on how to detect sex trafficking and failing to implement or enforce adequate sex-trafficking education and training for hotel staff;

d.  creating an environment that implicitly encouraged traffickers by allowing them to operate openly without the need to take significant steps to conceal their activities;

e.  allowing unrestricted and untracked access to the hotel by a high volume of commercial sex buyers without monitoring, restricting, or documenting their presence; and

f.  adopting operational policies and practices that were known to facilitate sex trafficking while disregarding established industry knowledge about policies and practices known to deter and detect sex trafficking and related criminal activity.

**VI.  The RRI Defendants Knew or Should Have Known They were Facilitating Trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn.**

135.    The RRI Defendants supervised and exercised oversight over the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

136.    Upon information and belief, the RRI Defendants knew or should have known about the widespread trafficking and related criminal activity at the Lubbock Red Roof Inn and Amarillo Red Roof Inn, based on:

a.  The obligation of hotel staff and hotel management to report suspected criminal activity to the RRI Defendants;

b.  The RRI Defendants' regular monitoring of online reviews;

c.  The RRI Defendants' collection and monitoring of customer surveys and complaints;

d.  The RRI Defendants' regular inspections of the hotel properties;

e.  Information provided to the RRI Defendants by law enforcement; and

f.  Other sources of information available to the RRI Defendants.

137.    Upon information and belief, under the RRI Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the RRI Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the RRI Defendants prior to K.D.'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

138.    RRI Defendants had constructive knowledge of the widespread and ongoing trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn because this trafficking resulted from their failure to reasonable diligence operating these hotels.

139.    Upon information and belief, RRI Defendants participated directly in aspects of the operation of the Lubbock Red Roof Inn and Amarillo Red Roof Inn that influenced whether and to what extent trafficking occurred at the hotel, including the trafficking of K.D., as follows:

a.  They retained control over and responsibility for training related to detecting and responding to human trafficking.

b.  They retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking.

c.  Dictating policies for monitoring and surveillance of RRI hotels.

d.  They were responsible for maintaining, monitoring, and analyzing patterns of criminal activity in RRI hotels.

e.  Dictating when and how hotel staff and franchisees should interact with law enforcement.

f.  They assumed responsibility for distributing safety-related information, including information related to trafficking, to franchisees and hotel staff.

g.  They assumed responsibility for monitoring circumstances and events associated with a high risk of trafficking and notifying franchisees and hotel staff of the same;

h. They retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the hotel, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

i. They retained control to assess or audit hotel properties, specifically, for the purpose of evaluating whether safety and security measures, including those related to trafficking, are in place.

j. They retained control to develop property-specific protocols for hotels that were experiencing a particular type of criminal activity.

140. RRI Defendants directly participated in and retained day-to-day control over renting rooms at the Lubbock Red Roof Inn and Amarillo Red Roof Inn by, among other things:

a. They controlled all details of the guest reservation, check-in, and payment processes through management of and control over all systems used for those processes and through adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes.

b. They directly took reservations for rooms at the Lubbock Red Roof Inn and Amarillo Red Roof Inn and accepted payment for those rooms through a central reservation system that they controlled and operated.

c. They could make reservations and take payment for rooms without any involvement or approval by the franchisees.

d. When a guest did not make a reservation in advance through the central reservation system, they still controlled the specific process used to register a walk-in guest and generate a reservation for that guest by requiring its franchisee to use a RRI system to process the room rental and payment.

e. They set or otherwise controlled room prices, required discounts, and reward programs.

f. They controlled all guest data related to room rentals.

g. They set policies on refusing service.

h. They controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

i.  They required hotel staff and management to notify them when evicting a guest from a room.

j.  They established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the hotel until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

k.  They required franchisees to use a property management system, which was owned, maintained, and controlled by RRI Defendants, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, they had direct involvement in room rentals.

l.  They oversaw do not rent (DNR) lists for their branded properties.

m.  They collected, tracked, and reported comprehensive information about each guest.

141.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn, RRI Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including K.D.

142.    RRI Defendants knew or should have known that K.D. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate K.D.'s sexual exploitation.

143.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn, the RRI Defendants continued participating in a venture at those hotels, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including the following:

a.  They adopted inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

b.  They implicitly condoned and endorsed repeated decisions by franchisees and hotel staff not to report or respond to trafficking appropriately.

c.  They encouraged hotel staff and franchisees to focus on revenue rather than preventing use of rooms for criminal activity, including trafficking.

d.  They continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking.

e.  They adopted policies and practices that allowed traffickers to reserve rooms using fake names and without providing valid identification matching the name on the room reservation.

f.  They adopted policies and practices allowed traffickers to reserve rooms using prepaid cards and cash, which provided relative anonymity and non-traceability.

g.  They adopted policies and practices that allowed access to high volumes of unregistered guests all going into the same room without logging these guests or requiring identification.

h.  They attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

i.  They reduced security costs by foregoing proper security measures.

j.  They continued to allow the Lubbock Red Roof Inn and Amarillo Red Roof Inn to use RRI trademarks despite actual or constructive knowledge of widespread and ongoing sex trafficking.

144.   If RRI Defendants had exercised reasonable diligence when operating the RRI and in the areas where it retained control, RRI Defendants would have prevented the RRI from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of K.D. Instead, RRI Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of K.D.

**VII.  Defendants' ventures at the Lubbock Red Roof Inn and Amarillo Red Roof Inn.**

145.   Through the actions described above, each Defendant participated in a venture that the Defendant knew or should have known had engaged in violations of the TVPRA.

146.    Each Defendant directly benefited from facilitating trafficking at its respective hotel(s), including in the following ways:

    a.  Each Franchisee Defendant directly benefited from increased revenue each time a room was rented at its respective hotel, including each room rented to a trafficker.

    b.  Each of the RRI Defendants received increase revenue each time a room was rented at the Lubbock Red Roof Inn or Amarillo Red Roof Inn, including each room rented to a trafficker. Upon information and belief, the revenue derived from operation of the Lubbock Red Roof Inn and Amarillo Red Roof Inn was distributed among RRI Defendants pursuant to written agreements and established practices.

147.    By participating in a venture that facilitated sex trafficking, each of the RRI Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base seeking to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Lubbock Red Roof Inn and Amarillo Red Roof Inn specifically.

148.    Through the conduct described above, Defendants knowingly benefited from engaging in a venture, in the form of an ongoing business relationship, with sex traffickers at its respective hotel(s), including K.D.'s trafficker, as follows:

    a.  As detailed above, each Defendant received benefits, including increased revenue, every time a room was rented at its respective hotel(s)

    b.  This venture violated 18 U.S.C. §1591 through the actions of the criminal traffickers at the Lubbock Red Roof Inn and Amarillo Red Roof Inn, which each Defendant knew or should have known about.

    c.  Defendants associated with traffickers, including K.D.'s trafficker, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

    d.  Sex traffickers, including K.D.'s trafficker, frequently used the Lubbock Red Roof Inn and Amarillo Red Roof Inn for their trafficking because of an implicit understanding that these hotels provided a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Defendants facilitating that

trafficking as described above. This resulted in benefits, including increased revenue, for Defendants.

e.  Each of the Defendants participated in this venture through the conduct described throughout this pleading as each Defendant was jointly responsible for operation of its hotel(s).

f.  K.D.'s trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn resulted from Defendants' participation in a venture with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from K.D.'s trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

149.    Through the conduct described above, each of the Defendants also knowingly benefited from engaging in a commercial venture with other Defendants and with staff at its respective hotel(s) as follows:

a.  Defendants associated with one another and with the hotel staff to operate the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

b.  As detailed above, each Defendant received financial benefits from operating the Lubbock Red Roof Inn and Amarillo Red Roof Inn, including revenue generated specifically by renting rooms to traffickers. Defendants engaged in revenue sharing and had a common incentive to maximize revenue.

c.  This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the Defendants' facilitation of widespread sex trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

d.  Despite actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), each Defendant participated in the venture by continuing to associate with the hotel staff and with other Defendants to operate the Lubbock Red Roof Inn and Amarillo Red Roof Inn in a way that the Defendants knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like K.D..

e.  K.D.'s trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn resulted from the hotel staff and Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Lubbock Red Roof Inn and Amarillo Red Roof Inn. Had Defendants not continued participating in a venture that they knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from K.D.'s trafficking at the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

VIII.    **Franchisee Defendants Operated as Agents of the RRI Defendants.**

150.    In addition to the RRI Defendants' direct involvement in hotel operations through the means outlined above, the RRI Defendants also participated in the ventures through the acts and omissions of Franchisee Defendants, which are the RRI Defendants' actual agents for the purpose of operating the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

151.    RRI Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee and the staff at the Lubbock Red Roof Inn and Amarillo Red Roof Inn, which are RRI Defendants' actual agents or subagents.

152.    The RRI Defendants subjected Franchisee Defendants and its staff to detailed standards and requirements regarding the operation of the Lubbock Red Roof Inn and Amarillo Red Roof Inn through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the RRI Defendants.

153.    The RRI Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the RRI Defendants imposed on the franchisees:

  a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Lubbock Red Roof Inn and Amarillo Red Roof Inn;

  b.  covered virtually all aspects of hotel operations, including internal operating functions;

  c.  dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the Lubbock Red Roof Inn and Amarillo Red Roof Inn; and

d. significantly exceeded what was necessary for RRI Defendants to protect its registered trademarks.

154. In addition to the ways described above, upon information and belief, RRI Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Lubbock Red Roof Inn and Amarillo Red Roof Inn, including the following ways:

a. imposing robust reporting and recordkeeping requirements on all hotels, including franchised hotels;

b. requiring all hotels, including franchised hotels, to use a consolidated IT system and database for property management as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated;

c. requiring franchisees to allow RRI Defendants to install antivirus and web filtering software and to monitor and maintain computers at the front desk and in the back office;

d. controlling "a fully integrated database" which all hotels, including franchised hotels, must use to access customer data, reservations, and other information that is shared system-wide between the RRI Defendants and their system hotels;

e. fixing prices for all hotels, including franchised hotels;

f. mandating specific training for franchisees and hotel management at franchised hotels;

g. mandating on-site training for hotel staff at franchised hotels;

h. requiring online training for franchisees and staff of franchised hotels through the Red Roof Learning Management System;

i. requiring use of standardized training methods for employees of franchised hotels;

j. retaining sole discretion to determine whether training has been completed in a satisfactory manner;

k. requiring hotel management at franchised hotels to attend conferences and meetings;

l. adopting detailed job descriptions for employees to staff all hotels, including franchised hotels, and drafting policies and requirements that specifically dictate

which staff members must perform day-to-day functions and how they must perform those functions;

m.  controlling channels for guests to report complaints or provide feedback regarding franchised hotels and supervising and/or dictating the response to those complaints;

n.  retaining the right to intervene directly to resolve a guest complaint about a franchised hotel and requiring the franchisee to reimburse the RRI Defendants for any payment or other consideration paid to a complaining guest;

o.  retaining the ability to require all franchised hotels to participate in centralized operational services;

p.  controlling all aspects of facility and building design and maintenance at franchised hotels;

q.  collecting, monitoring, and analyzing dozens of reports regarding franchised hotels through the backend of the property management system and using these reports to supervise and control the day-to-day operations;

r.  exercising significant control over franchisees' procurement by designating what specific equipment and supplies franchisees must buy and designating approved vendors from which purchases can be made;

s.  requiring franchised hotels to use approved vendors for internet services;

t.  imposing other requirements for Wi-Fi access and filtering at franchised hotels;

u.  imposing detailed insurance requirements for franchisees;

v.  posting jobs for both corporate and franchised properties;

w.  dictating interview techniques and questions for specific positions

x.  providing benefits to employees of franchised properties;

y.  controlling all marketing for franchised properties;

z.  assuming control of media for all properties;

aa. retaining nearly unlimited right to revise policies or adopt new requirements for day-to-day operations of franchised properties;

bb. other actions that deprived franchisees of independent in the business operations in operating RRI hotels.

cc. regularly inspected the Lubbock Red Roof Inn and Amarillo Red Roof Inn and other franchised hotels.

155.    The RRI Defendants specifically retained control of the day-to-day operation of Franchisee and its staff with regards to aspects of operation of the Lubbock Red Roof Inn and Amarillo Red Roof Inn that caused K.D.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

156.    Upon information and belief, each of the RRI Defendants acted, individually and collectively with the other RRI Defendants, to implement these mechanisms of control over RRI branded properties and RRI franchisees.

157.    At all relevant times, Franchisee and its staff acted as agents of the RRI Defendants when operating the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

## VII.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION: LIABILITY UNDER 18 U.S.C. §1595(A) (ALL DEFENDANTS)**

158.    K.D. incorporates all other allegations as if set forth in full herein.

159.    K.D. is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C. §1595(a) against the perpetrator of any violation of the TVPRA as well as against any person or entity that knowingly benefited, financially or otherwise, from participation in a venture that it knew or should have known was engaged in sex trafficking.

160.    Through the acts and omissions described above, each Defendant participated in a venture as a beneficiary within the meaning of § 1595(a) through its business relationships with traffickers operating at its respective hotel(s), including K.D.'s traffickers:

a. Each such venture arose from the development and continuation of a commercial relationship between traffickers and the respective hotel, which was formed and maintained when Defendants repeatedly rented rooms to traffickers despite obvious and persistent red flags of sex trafficking and created and maintained an environment at the hotel that facilitated trafficking activity.

b. Each Defendant knowingly benefited from participation in its respective venture because it received increased revenue and other financial benefits when rooms and services at its hotel were provided to traffickers, including K.D.'s traffickers, as described above.

c. Each venture was engaged in violations of the TVPRA through the conduct of the traffickers, who repeatedly harbored, maintained, provided, and exploited victims, including K.D., at Defendants' hotels.

d. Each Defendant knew or should have known that its venture was engaged in violations of the TVPRA, including the trafficking of K.D., as evidenced by the numerous and obvious red flags described above concerning the trafficking activities of K.D.'s traffickers and other traffickers regularly operating at its hotel. Further, each Defendant is charged with constructive knowledge as this trafficking would have been detected or deterred had each Defendant exercised reasonable prudence in the operation of its hotel.

161.    Additionally, through the acts and omissions described above, each Defendant participated in a venture as a beneficiary under § 1595(a) through its commercial undertaking operating its respective hotel:

a. Each Defendant's operation of its hotel constituted a commercial undertaking involving both risk and the potential for profit;

b. his commercial undertaking was engaged in violations of the TVPRA because numerous victims, including K.D., were harbored, maintained, provided, and exploited at Defendants' hotels, and the operation of those hotels facilitated this trafficking;

c. Defendants knew or should have known that they were operating their hotels in ways that facilitated sex trafficking, including by tolerating obvious trafficking indicators and failing to take reasonable steps to prevent or disrupt the trafficking; and

d. Defendants knowingly benefited from participation in this venture because they received increased revenue and other financial benefits when they rented rooms to traffickers and attracted repeat business from traffickers who selected hotels based on the ease with which they could conduct trafficking without interference.

**SECOND CAUSE OF ACTION: VICARIOUS LIABILITY OF RRI DEFENDANTS.**

162.    Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its agents and subagents.

163.    Franchisee Defendants and the hotel staff acted as the actual agents and subagents of RRI Defendants when operating the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

164.    Through the acts and omissions described above, RRI Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendants and the hotel staff to operate the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

165.    RRI Defendants are vicariously liable for the TVPRA violations of Franchisee Defendants and the hotel staff of the Lubbock Red Roof Inn and Amarillo Red Roof Inn.

166.    Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

167.    On information and belief, each of the RRI Defendants participated in a joint venture. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another.

**THIRD CAUSE OF ACTION: JOINT AND SEVERAL LIABILITY**

168.    K.D. incorporates all other allegations as if set forth in full herein.

169.     As explained above, each Defendant is liable under the TVPRA for injuries resulting from K.D.'s trafficking. Thus, joint and several liability is available against all Defendants.

## VIII.     DAMAGES

170.    K.D. adopts and re-alleges each paragraph above as if set forth herein.

171.    Including the damages specifically alleged above, K.D. seeks the following damages from all Defendants.

172.    As a result of Defendants' violations of the TVPRA, K.D. is entitled to be compensated for personal injuries and economic damages, including:

      a.    Actual damages (until trial and in the future)
      b.    Incidental and consequential damages (until trial and in the future);
      c.    Mental anguish and emotional distress damages (until trial and in the future);
      d.    Lost earnings and lost earning capacity (until trial and in the future);
      e.    Necessary medical expenses (until trial and in the future);
      f.    Life care expenses (until trial and in the future);
      g.    Physical pain and suffering (until trial and in the future);
      h.    Physical impairment (until trial and in the future);
      i.    Emotional impairment (until trial and in the future);
      j.    Exemplary/Punitive damages;
      k.    Attorneys' fees; and
      l.    Costs of this action.
      m.    Pre-judgment and all other interest recoverable.

173.    Plaintiff seeks an award of punitive damage as recoverable under the TVPRA.

174.    The damages sought are greatly in excess of the minimum jurisdictional limits of this Court, as the jury determines to be just and fair.

## IX.    TOLLING OF LIMITATIONS

175.    To the extent Defendants assert an affirmative defense based on the statute of limitations, K.D. invokes the discovery rule.

176.    Through at least 2018, K.D. was under the coercion and control of her traffickers, who abused, manipulated, and exploited her.

177.    K.D.'s traffickers kept her dependent on drugs, including by forcibly injecting her with heroin, which impaired her ability to understand the nature of her injuries and the causal connection between those injuries and Defendants' conduct.

178.    K.D.'s traffickers also subjected her to psychological abuse and manipulation designed to prevent her from identifying as a victim or seeking help—tactics that are common in sex trafficking.

179.    While she was under the control of her traffickers, K.D. —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of K.D. being kept under the control of her trafficker.

180.    While under the control of her traffickers, K.D.—through no fault of her own— lacked the information necessary to bring a civil claim because she did not know, and could not reasonably have known, both the existence of her legal injury and its cause. This lack of knowledge was a direct result of the coercion, abuse, and control exercised by her traffickers.

181.    As a result, K.D. did not discover, and could not reasonably have discovered, the legal cause of her injuries more than ten years before she filed this action.

182.    In the alternative, and to the extent Defendants assert a limitations defense, K.D. invokes the doctrine of equitable tolling. As a result of being a victim of sex trafficking, K.D. faced extraordinary circumstances—arising through no fault of her own—that prevented her from timely filing suit. These circumstances did not end more than ten years before this action was filed and would have prevented a person exercising reasonable diligence from recognizing and pursuing her legal rights.

183.    In addition, to the extent Defendants assert a limitations defense, K.D. invokes the continuing-violation doctrine because this action arises from an ongoing pattern of tortious conduct, including repeated acts facilitating her trafficking, that continued and ended within ten years of the date this lawsuit was filed.

## X. <u>JURY DEMAND</u>

184.    In accordance with Rule 216 of the Texas Rules of Civil Procedure, Plaintiff hereby makes application for a jury trial and request that this cause be set on the Court's Jury Docket.  In support of her application, the appropriate jury fee has been paid to the Clerk at least thirty-days (30) in advance of the trial setting.

## XI.    <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Plaintiff may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**PROVOST★UMPHREY LAW FIRM, L.L.P.**

By: */s/ Bryan O. Blevins, Jr.*
BRYAN O. BLEVINS | SBN 02487300
MATTHEW C. MATHENY | SBN 24039040
JAQUELINE RYALL | SBN 17469445
COLIN D. MOORE | SBN 24041513
350 Pine Street, Suite 1100
Beaumont, Texas 77701
(409) 835-6000
(409) 838-8888 Facsimile
mmatheny@pulf.com
bblevins@provostumphrey.com
jryall@provostumphrey.com
cmoore@provostumphrey.com

**ANNIE MCADAMS PC**
Annie McAdams | SBN 2405104

1150 Bissonnet
Houston Texas 77005
(713) 785-6262
(888) 713-0451 Facsimile
annie@mcadamspc.com

**SICO, HOELSCHER, HARRIS, LLP**
David E. Harris | SBN 24049273
Morgan A. Malouf | SBN 24127767
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com
mmalouf@shhlaw.com

**THE GALLAGHER LAW FIRM**
Michael T. Gallagher | SBN 07586000
Pamela McLemore | SBN 24099711
2905 Sackett Street
Houston, Texas 77098
(713) 222-8080
(713)222-0066 Facsimile
mike@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2026, the foregoing was filed with the Clerk of the court and served on all counsel of record through electronic mail in accordance with Rule 13.3(h) of the Texas Rules of Judicial Administration and Rule 21 of the Texas Rules of Civil Procedure.

<u>/s/ Bryan O. Blevins, Jr.</u><br>
Bryan O. Blevins, Jr.